2003 VT 2

## In re Grievance of Randy Hurlburt

[820 A.2d 186]

No. 01-138

Present: **Amestoy, C.J., Dooley, Morse and Skoglund, JJ., and Kupersmith, D.J., Specially Assigned**

Opinion Filed January 10, 2003

*Kimberly B. Cheney* of *Cheney, Brock & Saudek, P.C.*, Montpelier, for Plaintiff-Appellant.

*William H. Sorrell*, Attorney General, and *William B. Reynolds*, Assistant Attorney General, Montpelier, for Defendant-Appellee.

¶ 1. **Skoglund, J.** Grievant Randy Hurlburt appeals from an order of the Vermont Labor Relations Board (VLRB or Board) dismissing his grievance. Grievant claims that his employer did not have just cause to dismiss him. He further claims that the Board upheld his dismissal for reasons different from those given by his employer when dismissing him, thereby violating his due process right to notice. We find no support for these claims and affirm.

¶ 2.   Grievant was employed by the State (employer) for approximately twenty years. From 1995 until his dismissal in February 2000, he was employed as a supervisor in the Department of Buildings and General Services Microphotography Section in Middlesex. During that period, his overall performance was consistently rated average or above average. He was disciplined three times during his twenty year tenure with the state, resulting in suspension twice and one written reprimand.

¶ 3.   From the facts as found by the VLRB, we learn the following: grievant's supervisory responsibilities included overseeing the unit in which his girlfriend, Catherine MacDonald, worked. As of November 1999, grievant and MacDonald had lived together in Waterbury for approximately three years. On November 24, 1999, the day before Thanksgiving, grievant took the day off from work to go hunting. After hunting, grievant drove to pick up MacDonald from work at the parking lot on employer's premises. Upon arrival, grievant appeared intoxicated, and MacDonald suggested that she drive home. A disagreement between the two ensued and resulted in shoving. Grievant and MacDonald then got into the vehicle, and along with MacDonald's two children, left the premises. Before arriving at their apartment, grievant got out of the vehicle. MacDonald drove to the apartment with her children.

¶ 4.   Grievant arrived at the apartment soon thereafter. He kicked MacDonald in the back and then shoved MacDonald into a chair, causing her to fall to the floor. After several further confrontations with grievant, MacDonald and her children left the apartment and walked approximately four miles to the Vermont State Police barracks in Middlesex. Arrangements were then made for MacDonald and her children to stay at a battered women's shelter.

¶ 5.   MacDonald and her children spent the Thanksgiving holiday at the battered women's shelter. The next day, MacDonald filed a complaint against grievant requesting emergency relief from abuse, in which she detailed the events described above in an affidavit and stated that she was afraid of grievant. A Temporary Relief from Abuse Order (TRO) was granted. The TRO mandated that grievant "shall not telephone, write to, contact or otherwise communicate with the plaintiff in any way . . . this includes any work related contact." It further provided that grievant "shall not place himself within 500 feet of plaintiff individually or . . . plaintiff's children and residence. While at work Defendant shall not place himself within 50 feet of plaintiff."

¶ 6.   On Monday, November 29, grievant informed unit supervisor John Yacavoni that he had been served with a TRO. Yacavoni ordered grievant

to abide by the TRO. Yacavoni also warned grievant to stay away from MacDonald or find himself in additional trouble.

¶ 7. Over the next two days, grievant, while at work, sent eight e-mail messages to MacDonald. After sending these messages, grievant enlisted the help of the office computer system administrator to delete them. Although the e-mail messages were deleted, they were not erased from the "wastebasket" in MacDonald's e-mail account. These e-mail messages were later discovered by MacDonald and shown to the police.

¶ 8. On December 3, grievant was arraigned in Barre District Court on the charge of domestic assault. Among his conditions of release were that he "shall not purchase, possess or consume any alcoholic beverages . . . shall not associate with Catherine MacDonald, nor personally contact, harass, or cause to be harassed same," and that he "shall not be within fifty feet of victim."

¶ 9. On December 6, Yacavoni observed both grievant and MacDonald smoking cigarettes on a loading dock, which is one of the office's two smoking areas. They were less than fifty feet apart. On the same or following day, a co-worker approached the interior smoking room and heard grievant and MacDonald arguing therein. The co-worker overheard MacDonald mentioning something about "victim's assistance," and grievant talking about the "new friends" MacDonald was making. Two days later, Yacavoni relieved grievant of any supervisory responsibilities over the unit in which MacDonald worked.

¶ 10. On December 13, Vermont State Trooper Barney went to grievant's apartment to issue grievant a citation for violating the TRO as a result of the e-mail messages grievant sent to MacDonald. When Trooper Barney arrived, she found MacDonald and grievant together in the apartment; this was a direct violation of grievant's court-ordered conditions of release. The following day, grievant was arraigned in Barre District Court on charges that he violated both the TRO and his conditions of release. The court imposed additional conditions of release, including the condition that grievant abide by the previous conditions of release imposed on December 3.

¶ 11. On the evening of December 16, grievant violated several conditions of his release: grievant drank alcohol, had contact with MacDonald, and did not abide by his curfew. As a result, he was arrested. Grievant was incarcerated until Monday, December 20. During this period, grievant missed two days of work and did not inform Yacavoni of his incarceration until the day following his release. Grievant submitted a time sheet claiming eight hours of sick leave for the work days he missed while incarcerated. Employer denied grievant's request for sick leave and

classified his absence while incarcerated as unauthorized. On December 21, grievant entered a residential alcohol treatment program. Yacavoni authorized grievant to take sick leave for this absence.

¶ 12.  On December 30, Bradley Ferland, business manager for employer, sent a letter warning grievant that violating his conditions of release would be viewed as workplace misconduct that could lead to dismissal. The letter ordered grievant:

> not to have contact or communication with Catherine [MacDonald] or be within 50 feet of her while at work. You are hereby ordered as a condition of your employment to adhere to any and all such conditions. I am notifying you that any violation of these conditions will be treated as misconduct and work place discipline up to and including dismissal will follow.

¶ 13.  Grievant returned to work on Monday, January 3, 2000. To enable grievant to abide by the court-imposed restrictions and Ferland's directive, Yacavoni created an arrangement requiring grievant to contact someone in the unit where MacDonald worked, who would then ask MacDonald to leave the area, when grievant had to enter that unit. However, grievant and MacDonald were observed conversing in her work area contrary to the arrangement and in violation of his supervisors' orders. Additionally, on January 4, a co-worker observed MacDonald and grievant together in grievant's office.

¶ 14.  Employer retained an investigator to investigate grievant's alleged misconduct occurring from late November 1999 through early January 2000. During this investigation, the investigator asked grievant whether he had an argument in the smoking room with MacDonald on or about December 6, 1999. Grievant replied that he did not recall the incident. The investigator considered grievant's response a lie.

¶ 15.  On February 11, 2000, Deputy Commissioner Thomas Sandretto sent grievant a *Loudermill* letter* advising him that the department was contemplating a serious disciplinary charge against him, up to and including dismissal. The letter listed the following reasons for the disciplinary action:

> As a result of your behavior described below, the Department of Buildings and General Services is contemplating serious disciplinary action against you, up to and including dismissal from the position of Microphotography Supervisor . . . .

---

* See *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985).

The reasons serious disciplinary action is contemplated are as follows:

1) On or about November 26, 1999, you assaulted Catherine MacDonald. This off-duty conduct was work-related misconduct because Ms. MacDonald is a subordinate employee of this Department who works in the unit that you supervise.

2) You were given a direct order from John Yacavoni on November 29, 1999 to abide by a Temporary Restraining Order (TRO) that was issued by a Vermont Family Court Judge on November 26, 1999 . . . The TRO, and Director Yacavoni's order, prohibited you from telephoning, writing, contacting, or otherwise communicating with Ms. MacDonald in anyway [sic], and from coming within 500 feet of Ms. MacDonald, or fifty feet at work. The TRO conditions were in effect through December 9, 1999. On December 3, 1999, a Vermont District Court Judge issued an order specifying conditions on your release from custody of the state. The conditions included a prohibition on your contacting, harassing, causing to be harassed, and associating with Catherine MacDonald. Those conditions also prohibited you from being within fifty feet of Ms. MacDonald. On December 30, 1999, Bradley Ferland [business manager for employer] gave you a written order to comply with all Conditions of Release imposed by the District Court. On January 4, 2000, Director Yacavoni verbally gave you an additional direct order to stay away from Catherine MacDonald. You violated the orders of Director Yacavoni and Bradley Ferland, as indicated, by the following acts:

> (a) On November 30, 1999, you sent three e-mail messages to Ms. MacDonald using the computer assigned for your work use . . . .
> (b) On December 1, 1999, you sent five e-mail messages to Ms. MacDonald using the computer assigned for your work use . . . .
> (c) You came within fifty feet of Ms. MacDonald on or about December 5, 1999, when you were observed together smoking cigarettes in the loading dock area . . . .
> (d) On or about December 6 or 7, 1999, you were observed in the smoking room at work with Ms. MacDonald and you were having a heated conversation with her . . . .

(e) On or about January 4, 2000, you were in your office with Ms. MacDonald . . . .

(f) At various times between January 3, 2000 and January 10, 2000, you entered Ms. Macdonald's work area on several occasions. These actions violated Bradley Ferland's order and, in all instances after January 4, 2000, violated Director Yacavoni's order as well.

3) In addition to constituting violations of the orders issued by Yacavoni and Ferland, the acts described above in paragraph two are criminal acts in violation of Vermont statutes that were committed in the workplace and on work time. For the period from December 3 to December 9, 1999, your actions described above were in violation of both the TRO and the Conditions of Release.

4) You were absent from work without authorized leave on December 17 and 20, 1999.

5) On or about December 3, 1999, using computers belonging to the Department of Buildings and General Services, you attempted to delete from Ms. MacDonald's e-mail account the e-mail messages that you sent to her on November 30 and December 1. This occurred in the workplace and on work time. In attempting to delete the messages you were attempting to destroy evidence of your workplace misconduct and evidence of a crime. Misusing departmental resources in that manner also constitutes violation of . . . the Rules and Regulations for Personnel Administration . . . and the code of conduct for state employees . . . , which each prohibit use of State property and time for personal interests or gain.

6) During the investigation of this matter you were asked about your contact with Ms. MacDonald in the smoking room on or about December 6 or 7. You were observed having a heated conversation or argument with her. You said that you did not honestly recall such contact. I believe that your statement, effectively denying this significant event, was a lie.

I am also considering your entire history of discipline as an employee of the State of Vermont.

¶ 16. On February 18, a *Loudermill* meeting was held at the department. Grievant and his Vermont State Employees' Association

representative were present and responded to the issues raised in the *Loudermill* letter. During the meeting, grievant generally denied the charges against him and questioned the department's motives. Grievant denied assaulting MacDonald and denied that he had argued with her in the smoking room.

¶ 17. The decision to discharge grievant from his position with the state was made by Deputy Commissioner Sandretto after discussions with employer's managers, and with representatives from the Department of Personnel. By letter dated February 23, 2000, Sandretto informed grievant that he was dismissed for the reasons set forth in the *Loudermill* letter. Grievant filed a grievance with the VLRB claiming that he was improperly dismissed. Grievant now appeals the Board's dismissal of his grievance to this Court.

¶ 18. This Court affords great deference to decisions that lie within the Board's area of expertise. *In re Carlson*, 140 Vt. 555, 560, 442 A.2d 57, 60 (1982). We do not disturb findings made by the Board unless they are clearly erroneous. *In re Merrill*, 151 Vt. 270, 275, 559 A.2d 651, 654 (1988) ("[S]o long as the finding is supported by a quantity of evidence which is more than a mere scintilla, this Court will not reverse the Board's findings unless they are clearly erroneous.") (internal quotations omitted). We will normally sustain the Board's order if it is supported by its own findings. *Carlson*, 140 Vt. at 560, 442 A.2d at 60.

¶ 19. On appeal, grievant disputes the Board's decision to dismiss his grievance on three grounds. First, grievant claims that the Board erred in upholding his dismissal because there was not a sufficient nexus between grievant's off-duty conduct and his employment to warrant discipline; that is, employer lacked just cause to dismiss him. Second, grievant argues that any work related incidents of misconduct were de minimis and could not form the basis for dismissal. Third, grievant claims that the Board's rationale upholding his dismissal was not found in the *Loudermill* letter issued by employer. Grievant's arguments fail on all grounds.

¶ 20. The definition of "just cause" is well established. "Just cause means some substantial shortcoming detrimental to the employer's interests, which the law and a sound public opinion recognize as a good cause for his dismissal." *In re Brooks*, 135 Vt. 563, 568, 382 A.2d 204, 207 (1977) (internal citation omitted). In *In re Morrissey*, 149 Vt. 1, 13, 538 A.2d 678, 686 (1987), we stated that the just cause analysis should "center upon the nature of the employee's misconduct." The ultimate criterion of just cause is "whether the employer acted reasonably in discharging the employee because of misconduct." *Brooks*, 135 Vt. at 568, 382 A.2d at 207-08. A dismissal for cause will be upheld if the court finds that: (1) it is

reasonable to dismiss the employee because of the conduct in question, and (2) the employee had fair notice, express or fairly implied, that such conduct could result in dismissal. *Id.*; *Carlson*, 140 Vt. at 559, 442 A.2d at 59. In cases where an employer disciplines or dismisses an employee for off-duty conduct, there must be a nexus between off-duty conduct and employment to justify the employer's disciplinary action against an employee for that conduct. *In re Ackerson*, 16 V.L.R.B. 262, 272 (1993).

¶ 21. Grievant does not take issue with the Board's determination that employer established the charges supporting its termination decision. Rather, grievant argues that there is no nexus between his off-duty conduct, including his domestic and criminal court problems, and grievant's job performance sufficient to justify his dismissal. An employee's off-duty assault of a girlfriend occurring away from an employer's premises may not, without more, provide the required nexus establishing just cause necessary for an employee discharge. That is not, however, the situation presented in this case. While grievant's assault on MacDonald, a subordinate, occurred away from employer's premises and after work hours, it was the precipitating event which led to directives and orders from grievant's superiors that grievant ultimately violated. The orders and restrictions placed upon grievant by the district court merely provided the template for the additional restrictions imposed by employer on grievant's workplace behavior. As identified in the *Loudermill* letter, grievant's failure to comply with the direct orders of his supervisors to abide by the court-imposed restrictions on grievant's interactions with MacDonald, his unauthorized absence from work, his attempted destruction of evidence demonstrating workplace misconduct and related misuse of departmental resources, and his lying to employer's investigator constituted the primary reasons for grievant's dismissal. Clearly, the offending behavior that resulted in grievant's dismissal was work-related.

¶ 22. The Board's determination that the charges proven against grievant established the just cause required for dismissal was based upon the factors articulated in *In re Colleran*, 6 V.L.R.B. 235, 268 (1983). The Board stated that the factors relevant to a just cause determination in this case were:

> 1) the nature and seriousness of the offenses and their relation to Grievant's duties and position, 2) Grievant's job level, including supervisory role, 3) the effect of the offense upon supervisors' confidence in Grievant's ability to perform assigned duties, 4) the clarity with which Grievant was on notice [of] any rules that were violated in committing the offenses, 5) the

consistency of the penalty with those imposed upon other employees for same or similar offenses, 6) Grievant's past disciplinary record, 7) Grievant's past work record 8) the potential for Grievant's rehabilitation, 9) mitigating circumstances surrounding the offenses and 10) the adequacy and effectiveness of alternative sanctions to deter such conduct in the future.

¶ 23. In applying the *Colleran* factors to the facts of the present case, we agree with the Board's finding of just cause for dismissal. Grievant was employed in a supervisory role. He was charged with assaulting a subordinate, fellow employee, which is a serious and an egregious offense. Grievant was ordered by a court to stay away from the subordinate both at and outside work. Grievant had been warned, both orally and in writing, by his superiors that he must abide by the court's order while in the workplace. Grievant disobeyed these directives by sending e-mail to MacDonald, by being in the same smoking area as her, by being in his office with her, and by being in MacDonald's work area while she was present. Grievant's actions violated express management directives and thus constituted insubordination. Insubordination is a serious offense because it weakens the confidence management has in an employee's reliability in carrying out directives from management. Cf. *In re Towle*, 164 Vt. 145, 149, 665 A.2d 55, 59 (1995) (grievant's sexual misconduct destroyed superior's trust in ability to perform assigned duties). Insubordination is grounds for dismissal. See *Morrissey*, 149 Vt. at 13, 538 A.2d at 686 (undermining employer's established policy and superior's authority detrimental to employer's interests).

¶ 24. The Board also found that, in light of the assault, grievant's position as MacDonald's supervisor brought personal problems into the workplace, which had a negative impact on his employment. As noted by the Board, "[m]anagement should be able to rely on supervisors interacting with their subordinates without the atmosphere being poisoned by past violent conduct." The Board looked at the effect of these offenses on grievant's ability to perform his job at a satisfactory level and its effect upon the confidence of his supervisors in grievant's ability to perform assigned duties. The Board concluded grievant "irreparably damaged" his supervisors' trust through repeated violations of the TRO and employer's directive to abide by that order. Accordingly, the conclusion that employer had just cause to terminate grievant is supported by the Board's findings. Generally, we will not overrule the Board's determination on this matter as it is "of the very nature which

lie[s] peculiarly within the expertise of the Board." *In re Merrill*, 151 Vt. at 274, 559 A.2d at 653.

¶ 25. However, grievant claims he lacked notice that violating his supervisor's order to comply with the TRO would be grounds for dismissal, arguing that not every violation of a supervisory order would provide just cause for dismissal. The ultimate question on the issue of whether an employee had fair notice is whether the conduct was or should have been known to the employee to be prohibited by the employer. *In re Graves*, 147 Vt. 519, 524, 520 A.2d 999, 1002 (1986). This is an objective standard. *Towle*, 164 Vt. at 150, 665 A.2d at 60. Grievant was expressly told by his supervisor to obey the trial court's order while at work. Therefore, grievant was aware that any violation of the TRO would be in defiance of a direct order from his supervisor. "Knowledge that certain behavior is prohibited and subject to discipline is notice of the possibility of dismissal." *Id.* Accordingly, grievant had fair notice that he risked dismissal by violating the orders of Ferland and Yacavoni. Cf. *Morrissey*, 149 Vt. at 10-11, 538 A.2d at 684 (dismissal letter in combination with oral notification extended notice of adequate specificity to grievant).

¶ 26. Grievant's second claim on appeal is that the violations of his conditions of release were de minimis and cannot support just cause for dismissal. Something is de minimis when it is so "insignificant that a court may overlook it in deciding an issue or case." Black's Law Dictionary 443 (7th ed. 1999). Grievant characterizes his violations as "accidentally meeting MacDonald on the smoking dock, deliberately meeting her in the smoking room, sending her e-mails and then deleting them, walking through MacDonald's work space and talking with her, and talking with MacDonald in his office." Here, grievant was dismissed for serious acts of insubordination, lying during an investigation, attempting to destroy evidence of workplace misconduct, and violating court orders, both at work and off duty. Grievant's repeated prohibited acts compounded the seriousness of his misconduct, and the Board found that these act justified his dismissal. See *Towle*, 164 Vt. at 150, 665 A.2d at 59 ("Repetition of acts that grievant knew to be forbidden justified the State's judgment that grievant was not a good candidate for . . . rehabilitation . . . and justified his discharge."). Just cause determinations are soundly within the expertise of the Board, and we accord the Board's determination its due deference. *Merrill*, 151 Vt. at 274, 559 A.2d at 653.

¶ 27. Grievant also makes the related claim that his two-day absence from work was not valid cause for dismissal. He asserts that employer made a moral judgment, and that because he was in jail as

opposed to an alcohol treatment center, employer considered grievant absent from work without authorized leave. We find it reasonable for employer to conclude that missing work due to incarceration is equivalent to unauthorized leave.

¶ 28. Finally, grievant claims that the Board's rationale upholding his dismissal was not found in the *Loudermill* letter given to him by employer and, as a result, his due process right of notice was violated. Specifically, grievant challenges the Board's holding that, "as a result of grievant's assault of MacDonald, employer lost a week of MacDonald's services because she spent a week at a battered women's shelter" and that the restraining order caused a disruption in the workplace by limiting contact between grievant and MacDonald. Grievant suggests that the reason MacDonald missed work was because she was sick with pneumonia.

¶ 29. The purpose of a *Loudermill* letter is to put an employee on notice of the charges against him and to act as a check for mistaken accusations. See *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985); *Rich v. Montpelier Supervisory Dist.*, 167 Vt. 415, 420, 709 A.2d 501, 504 (1998) (public employees with property interest in position entitled to oral or written notice of charges against them, and an explanation of employer's evidence); *In re Johnson*, 9 V.L.R.B. 94, 108 (1986). In reviewing a disciplinary action, the Board does not look beyond the reasons given by the employer in the disciplinary letter for the action taken. *In re Swainbank*, 3 V.L.R.B. 34, 48 (1980), *rev'd on other grounds*, *In re Swainbank*, 140 Vt. 33, 433 A.2d 313 (1981). Notice under *Loudermill* requires no more than notice of the charges, an explanation of the evidence and an opportunity for the employee to present evidence. *In re Gregoire*, 166 Vt. 66, 71-72, 689 A.2d 431, 434 (1996).

¶ 30. MacDonald testified that, indeed, she was ill with "walking pneumonia" during the period she was absent from work. However, when she called Yacavoni on Monday, November 29, 1999, to inform him of what had occurred between grievant and herself, MacDonald indicated that she was in a battered women's shelter and would be out of work that week. During this phone conversation, she asked Yacavoni whether, given the circumstances, she should quit or transfer from her job. This finding supports the Board's conclusion that MacDonald's absence was due primarily to grievant's assault and not to any illness she might be suffering. The fact that the loss of MacDonald's services was not cited as a reason for discipline in the *Loudermill* letter is of no moment.

¶ 31. Grievant was terminated for the reasons stated in the *Loudermill* letter: grievant assaulted a subordinate employee; he violated a

supervisor's direct order to abide by the TRO on six separate occasions, and those violations constituted criminal acts committed in the workplace and on work time; grievant had two days of unauthorized absence from work; he attempted to destroy evidence of workplace misconduct and of a crime; and grievant apparently lied to his employer's investigator. The Board found that employer had proved by a preponderance of the evidence all the misconduct stated in the *Loudermill* letter and concluded that there was just cause for dismissal. We agree with the Board's conclusions and find no error.

*Affirmed.*